## Watson's Executors *versus* Stem and Wife.

1. A daughter sued her father's estate for wages for services after she attained twenty-one, her last services being more than six years before suit. *Held*, that she must prove an express contract and a clear, distinct and unequivocal acknowledgment of the existence of the debt, within six years of the commencement of suit.

2. Where there is a distinct admission of an existing indebtedness for a specific sum, it is presumed to be a valid debt and the presumption must stand until overthrown by the attending circumstances or other evidence.

3. Evidence in this case sufficient for the jury on the question of indebtedness and the Statute of Limitations.

May 8th 1874.   Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Error to the Court of Common Pleas of *Adams county:* Of May Term 1874, No. 87.

This was an action of assumpsit commenced August 4th 1870, by William C. Stem and Eliza his wife in her right, against Robert Watson and James Watson, executors, &c., of James Watson, deceased.

Mrs. Stem was the daughter of the decedent; her claim was for wages for services rendered to her father, from the time she came of age March 22d 1843, until November 16th 1854, when she was married and left her father's house.   The pleas were " non assumpsit" and " non assumpsit infra sex annos."

The case was tried February 4th 1874, before Butler, P. J., of the 15th district.

The plaintiffs gave evidence that Mrs. Stem had worked at ordinary housework for her father continuously during the time for which she claimed to be paid.

Thomas Anderson testified that about the 1st of June 1849, in consequence of some disagreement with her brothers, Mrs. Stem was going to leave her father's house; her father told her if she would stay and do the work as she had been doing he would give her $2.50 per week and find her clothes. She said she would stay.

Mrs. Stoops testified that in and previously to January 1854, witness was living at the decedent's; Mrs. Stem was in charge of her father's house. "On Saturday before Christmas she went away on a visit to her friends about Hanover, and returned Saturday after New Year's. Mr. Watson was there when she returned and was displeased with her. He told her she should leave—he did not want her to stay. She went upstairs then to pack up her clothes. I told him he had better keep her—he would not get a better girl or woman in his house. He wanted me to stay in her place, and I told him I would not do it for $2 per week. I went up and asked her at his request if she would stay for $2.50 per week, and she said for not less than $3. I came down and told Mr. Watson. He said she should stay and he would give her the three dollars per week from that time when she came home after Christmas. She was to have $2.50 from time her mother died. I then after seeing him went upstairs and told Eliza he would give her $3 a week from that time. I told her that he said he would give her $2.50 per week from the time her mother died. She said she would stay when I repeated it to her. I don't know anything about the wages before her mother died."

John Stevens testified: "I met old Mr. Watson about 1866 at Dr. Stem's house, about June. No one was there but me and Stem and Watson. I said to Mrs. Stem, You are hard at it. She said, Yes I have worked hard all my life and haven't got much for it yet. And the old man replied, Eliza, I will pay you wages for all you have worked for me over age."

Sarah Cullison testified: "I met with James Watson at Dr. Stem's in 1865, in forepart of summer. I asked Mrs. Stem if that was her father, and she said yes. She asked her father for money and said she was going to buy land. He said he could not give it to her at this time. He said he had bought a farm in the mountain that he had to pay for and after that he would pay her wages. He said he knowed he had not paid her for what she worked for him, but he would pay her from the time she was of age or worked over age."

Henry Hahn testified: "I was at Stem's in *June* 1866, when

Watson was there.   Eliza and her father were there when I went in.   She said, 'Pap, you know I have worked hard for you over age, and that I have never got anything for it.'   He said, 'Eliza, I know you have worked hard over age, and I have never paid you, but I will pay you."   She asked him why he could not pay her some now as well as John.   He said, 'I must do as the boys say or I can't live with them.'   She asked him if he knew what he had promised her, and he said he did, and that it was $2.50 per week from the time she came of age until after her mother's death, and $3 after her mother's death per week as long as she remained with him."

Daniel Knouse testified: "I was at Dr. Stem's in 1865—*after harvest.*   James Watson was there in Stem's house.   I said to her, 'You are hard at work,' and she said she had been hard at work all the days of her life.   She said she had worked for her father a part of the time for $2, and part at $3 per week, and had not got anything for it yet.   The old man said he didn't see she was in great want—that he would pay her but not at the present time, but afterwards."

The wife of the decedent and mother of Mrs. Stem died January 16th 1851; he died in March 1870.

The defendants' point, which was declined, was:—

" The evidence of acknowledgments and new promises made within six years before the bringing of this suit, by James Watson, senior, to his daughter, Mrs. Stem, the plaintiff, is not sufficient in law to defeat the plea of the Statute of Limitations, and, therefore, there can be no recovery in this case."

The court charged:—

* * * "The claim runs back many years and is brought against the estate after the father's death.   It should therefore be scrutinized with great caution, if not suspicion, and should only be allowed in case it is fully and clearly proved, in the manner required by law.

" The defendant asks us to charge you that—' To enable a child to recover for acts of kindness or services rendered to a parent, there must be an express agreement and promise of the parent to pay for the services rendered; and unless there was such a contract proved as satisfies the jury that there was a promise on the part of the parent to pay for the services, the child cannot recover.'   And we do so charge you; such is the law.   To entitle the plaintiff, therefore, to recover any part of her claim she must prove to your satisfaction that the services on which it is founded were rendered in pursuance of an *express contract* on the part of her father to pay for them.   The law makes no *presumption* in her favor.   No contract can be implied, for the law presumes, in the absence of evidence to the contrary, that the services rendered by a child to the parent under such circum-

[Watson's Executors *v.* Stem.]

stances, are *not* to be paid for. An *express contract* to pay must, therefore, be proved, or the plaintiff must fail. But even more than this is necessary in the case before us. The *last* of the services having been rendered in 1854, the entire claim is *barred by the Statute of Limitations*, unless it is also proved that the father, within *six years* of this suit, *plainly and unequivocally* recognised and admitted his liability for the claim, as by a promise to pay it.

" The suit was brought on the 4th day of August 1870. Six years would take us back to August 4th 1864.

" Thus the plaintiff must prove not only that there was an express contract between her father and herself in pursuance of which the services were rendered, but also that her claim was distinctly and unequivocally acknowledged—as by a promise to pay it—within six years of August 4th 1870—that is, as late as August 4th 1864." * * *

The judge referred to the testimony of several of the witnesses and proceeded :—

" John Stevens says, that, in 1866, he was at Dr. Stem's and heard a conversation between Eliza and her father, in which she said she had worked hard all her life, and had not got much for it yet ; and that Mr. Watson replied, ' Eliza, I will pay you wages for all you worked for me over age.' The testimony of this witness must not be misunderstood. The language referred to by him neither creates a contract nor acknowledges one as previously existing. This was in 1866, after all the services were performed ; and a promise at that time, in the absence of a previous contract, would not bind Mr. Watson, nor have any force whatever. The only purpose for which this testimony can be appealed to, therefore, is to show acknowledgment of an existing legal claim within six years of suit brought, and you will judge whether it tends to this or not. Of itself it is of no value whatever." * * * He then stated the testimony of Sarah Cullison and said : " We need not repeat here what we have just said in connection with the testimony of the previous witness ; you will judge whether this was an acknowledgment of a *previously existing obligation* to pay the daughter wages—as upon a contract to do so. The time referred to by the witness, you will observe, was the summer of 1865." * * *

He then repeated Henry Hahn's testimony and said : " [This testimony is appealed to by the plaintiff as evidence of a previously existing express contract to pay wages during the entire period claimed for, and of a renewed promise to pay what was due, within six years of suit. You will determine what weight should be given to it for this purpose.] In considering it you will bear in mind the comments of counsel on both sides ; and also the admission of the witness that he heretofore declared he knew nothing about the case, which he undertakes to explain by saying, in effect, that he supposed the inquiry to be made for an improper purpose, the individual hav-

[Watson's Executors v. Stem.]

ing no interest in the matter. You will further bear in mind that the witness (as well as the others called), undertakes to give a conversation which occurred years ago, and will thus judge in how far he can be relied upon, and what weight should be attached to his testimony." * * *

"We now repeat, to entitle the plaintiff to recover, the evidence must satisfy your minds, *first,* that the services were rendered in pursuance of *an express contract* on the part of Mr. Watson to pay for them; and *second,* that he plainly and unequivocally acknowledged his liability for the claim or debt due under this contract within six years of the commencement of this suit. If the evidence does so satisfy your minds that the services were rendered in pursuance of such express contract, and that Mr. Watson did so distinctly and unequivocally acknowledge his liability under it for the claim, within six years of suit brought, your verdict will be for the plaintiff for such sum as you may find to be thus due to her."

The verdict was for the plaintiffs for $3483.

The defendant took a writ of error.

They assigned for error, the refusal of their point and the part of the charge in brackets.

*W. McClean* and *J. McD. Sharpe,* for plaintiffs in error.—To take a case out of the Statute of Limitations, the evidence of the acknowledgment of the debt must be clear, distinct and unequivocal: Farley v. Kustenbader, 3 Barr 418; Burr v. Burr, 2 Casey 284. A naked admission of indebtedness without indicating the amount or nature of the debt, is not sufficient: Shitler v. Bremer, 11 Harris 413; Huff v. Richardson, 7 Id. 388; Emerson v. Miller, 3 Casey 278; Clark v. McGuire, 11 Id. 259; Shaffer v. Shaffer, 5 Wright 51; Johns v. Lantz, 13 P. F. Smith 326. The acknowledgment must be of a subsisting debt: McClelland v. West, 9 P. F. Smith 488; Weaver v. Weaver, 4 Id. 154; Huff v. Richardson, 7 Harris 389.

*D. McConaughy* (with whom was *R. G. McCreary*), for defendants in error.—It belongs to the jury to ascertain the meaning of the words proved: 3 Starkie on Ev., 932, 933. A clear, distinct and unequivocal acknowledgment of a debt removes the bar of the statute: Johns v. Lantz, 13 P. F. Smith 324. He cited also Haslebacker v. Reeves, 2 Jones 264; Davis v. Steiner, 2 Harris 275; Suter v. Sheeler, 10 Id. 308. It was the province of the jury to pass upon the testimony both as to its credibility and its effect: and it was the duty of the court to submit it to them: Dougherty v. Stephenson, 8 Harris 210; Thomas v. Thomas, 9 Id. 315; Breinig v. Meitzler, 11 Id. 156; McIldowney v. Williams, 4 Casey 492; Balt. & Ohio Railroad Co. v. Hoge, 10 Id. 214; Bank v. Donaldson, 6 Barr 179; Hastings v. Eckley, 8 Id. 194; Fleming v. Parry, 12 Harris 47.

Mr. Justice MERCUR delivered the opinion of the court, May 25th 1874.

This was an action by a daughter, against the executors of her father. She claimed for services which she had performed for her father after she had arrived at the age of twenty-one years. More than six years had elapsed after the last services were rendered, before suit was brought. The plaintiffs in error denied any original legal obligation to pay, and also interposed the Statute of Limitations. Hence to enable the defendant in error to recover it was necessary for her to establish,

First. An express contract to pay.

· Secondly. A clear, distinct and unequivocal acknowledgment, within six years prior to the commencement of the suit, of the existence of the debt.

Both these propositions were so distinctly declared by the learned judge, that we do not understand the plaintiff in error to complain of the charge in that respect.

The errors assigned involve the sufficiency of the evidence to justify the court in leaving it to the jury to find those facts.

1. The evidence is conflicting as to the precise sum the father agreed to pay for her services. Thomas Anderson testified. that about the forepart of June 1849, some difficulty arose between the defendant in error and her brothers, and she expressed an intention of leaving. That her father "told her if she would stay and do the work as she had been doing, he would give her $2.50 per week and find her clothes. She said she would stay." She did stay.

Her mother died the 16th January 1851.

Mrs. Stoops testified that early in January 1854, the father was displeased with the defendant and told her he did not wish her to remain. That she then went upstairs to pack up her clothes. Then the father requested the witness to go and ask her if she would stay for $2.50 per week. The witness went and asked her. She replied she would not for less than $3. The witness returned and communicated this answer to the father. The negotiation resulted in his proposing to pay her $3 a week from the time she came home after Christmas, and previous to that $2.50 per week from the time her mother died. The defendant in error accepted this proposition, and remained until her marriage in November following. We think this evidence was clearly sufficient to justify the court in leaving to the jury to find an express agreement to pay for her services. Whether her wages were to commence in 1849 or not until the death of her mother, was for the jury to determine.

2. Sarah Cullison testified that in the summer of 1865, upon the defendant in error asking her father for money, he replied, " he knew he had not paid her for what she had worked for him, but he would pay her from the time she was of age or worked over age."

[Watson's Executors v. Stem.]

John Stevens heard him tell her in June 1866, " I will pay you wages for all you have worked for me over age."

Henry Hahn testified that he was at Stem's in June 1866, the father and daughter were both there. She said, " Pap, you know I have worked hard for you over age, and that I never have got anything for it." He said, " Eliza, I know you have worked hard over age, and I have never paid you, but I will pay you." She asked him if he knew what he had promised her, and he said he did, that it was $2.50 per week from the time she came of age until after her mother's death, and $3 after her mother's death per week as long as she remained with him."

This is evidence of a clear and distinct admission that he had agreed to pay for her services, from the time she became of age, naming the precise sum. It is not of an uncertain or casual remark made to a stranger. It was in a conversation between the parties, and in answer to a question put by the daughter to her father upon the precise point. With his attention thus called to it, he gave this explicit answer.

It is further evidence of an equally clear and distinct admission that he had never paid her, and of a positive promise to pay. The plaintiff in error contends that this admission made in 1866 may have been of a promise made after the services had been rendered, and as between parent and child insufficient to create a valid contract. We discover nothing in the language used to lead to that conclusion. The admission was made in a conversation when she was asking him " to pay her some now." In case of a distinct admission of an existing indebtedness for a specific sum, it is presumed to be a valid debt. This presumption must stand until overthrown, either by the attending circumstances or other evidence. We discover no evidence fairly leading to the conclusion claimed by the plaintiff in error. The evidence clearly justified the court in submitting to the jury to find whether the services were rendered in pursuance of an express contract on the part of the father to pay for them.

The proof of the father's acknowledgment, within six years before suit brought, of his continued indebtedness and of his liability to pay her, was so clear that the evidence was properly submitted to the jury. The case was submitted in a very lucid manner. We discover no error either in the general charge of the court, nor in the answers to the point submitted therefor.

Judgment affirmed.